UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------x

In re

GINGER YOUNG,

            Debtor

-----------------------------------------------------------------x

JOHN S. PEREIRA, as Trustee in
Bankruptcy of GINGER YOUNG,

            Plaintiff,

    -against-

GINGER YOUNG,

            Defendant

-----------------------------------------------------------------x

Chapter 7

Case No. 04-14794-ess

Adv. Pro. No. 04-1476-ess

**MEMORANDUM DECISION DENYING THE CHAPTER 7 TRUSTEE'S
OBJECTIONS TO THE DEBTOR'S DISCHARGE**

*Appearances*:

Ann Marie Sinisi, Esq.
Law Offices of John S. Pereira
150 East 58th Street
New York, NY 10155
  for the Chapter 7 Trustee

Michael D. Siegel, Esq.
Siegel & Siegel, P.C.
205 Lexington Avenue
New York, NY 10016
   for the Debtor/Defendant

This adversary proceeding (the "Adversary Proceeding") was commenced by the filing of a complaint (the "Complaint") by John S. Pereira, as Chapter 7 trustee (the "Trustee" or "Plaintiff") of the bankruptcy estate of Ginger Young, the debtor in the above-captioned Chapter 7 case and the defendant in this Adversary Proceeding (the "Debtor").  By his Complaint, the Trustee seeks to deny the Debtor a discharge in bankruptcy.

A trial was conducted before the Court on June 15, 2005 (the "June 15 Trial"), at which counsel for the Trustee and counsel for the Debtor appeared and were heard, and testimony was taken.  Thereafter, the parties attempted to resolve the issues through mediation but were unable to do so.  The trial record was closed on April 25, 2006, and the matter was submitted for decision.  Based on the entire record, including the testimonial and documentary evidence and the arguments of the parties, and for the reasons set forth below, the Trustee's objections to the Debtor's discharge are denied.

## Jurisdiction

This Court has jurisdiction pursuant to 28 U.S.C. §§ 1334(b) and 157(b).  This is a core proceeding pursuant to 28 U.S.C. §§ 157(b)(2)(A).  The following are the Court's findings of fact and conclusions of law after a trial pursuant to Rule 52 of the Federal Rules of Civil Procedure, as made applicable by Rule 7052 of the Federal Rules of Bankruptcy Procedure.

## Background

A.    Procedural History

The Debtor filed for relief under Chapter 7 of Title 11 of the United States Code (the "Bankruptcy Code") on April 6, 2004 (the "Petition Date").  The Trustee was appointed as interim Chapter 7 trustee, and thereafter qualified to become the permanent Chapter 7 trustee of the Debtor's estate.  The Debtor was examined at a Section 341 meeting of creditors on May 13,

2004 (the "May 13 Section 341 Meeting").  That examination was continued on July 7, 2004 (the "July 7 Section 341 Meeting"), and September 8, 2004 (the "September 8 Section 341 Meeting").

The Trustee filed the Complaint on September 29, 2004.  The Complaint includes five claims for relief.  By the first claim for relief (the "First Claim for Relief"), the Trustee seeks an order declaring that any and all postpetition transfers made by the Debtor are null and void as against the Trustee under Section 549 of the Bankruptcy Code.  The second claim for relief (the "Second Claim for Relief") seeks an accounting from the Debtor of all non-exempt property under Section 541 of the Bankruptcy Code.  The third claim for relief (the "Third Claim for Relief") seeks to deny the Debtor a discharge based on the Debtor's alleged unjustified acts or failures to act with respect to keeping and preserving recorded information under Section 727(a)(3) of the Bankruptcy Code.  The fourth claim for relief (the "Fourth Claim for Relief") seeks to deny the Debtor a discharge based on the Debtor's alleged knowing and fraudulent withholding of recorded information relating to her property and financial condition under Section 727(a)(4)(D) of the Bankruptcy Code.  The fifth claim for relief (the "Fifth Claim for Relief") seeks to deny the Debtor a discharge based on the Debtor's alleged failure satisfactorily to explain the deficiency of assets to meet her liabilities under Section 727(a)(5) of the Bankruptcy Code.

The Debtor filed an answer to the Complaint on October 8, 2004, in which she denies the allegations supporting the Trustee's objections to her discharge and request for avoidance of alleged postpetition transfers.  The Debtor seeks a judgment dismissing the Complaint.

As indicated above, this matter was tried by the Court on June 15, 2005.  The Trustee and the Debtor testified on their own behalf, and the Debtor offered the expert testimony and report of

Laura Boyd, MSW. At trial, the Trustee withdrew the First Claim for Relief relating to

postpetition transfers. Trial Tr. at 91:18-20.[1] At the close of the June 15 Trial, the parties agreed

that referral to court-annexed mediation could assist the parties in resolving the matter, and on

that same day, the Court entered a Mediation Referral Order. Adversary Docket No. 13. By

stipulation signed on August 11, 2005, the parties agreed upon a mediator and on August 18,

2005, the Court entered a Stipulation and Mediation Order. Adversary Docket No. 19. The Final

Report of Mediator filed on February 17, 2006, indicated that the mediation process ended in an

impasse. Adversary Docket No. 25.

A post-trial conference was held on March 28, 2006, at which the Trustee and counsel for

the Debtor appeared and were heard. At the conference, the Trustee confirmed that the First

Claim for Relief relating to postpetition transfers and the Second Claim for Relief seeking an

accounting were withdrawn. Accordingly, there remain for decision the Trustee's Third, Fourth,

and Fifth Claims for Relief under which the Trustee seeks to deny the Debtor a discharge under

Sections 727(a)(3), 727(a)(4)(D), and 727(a)(5) of the Bankruptcy Code.

A final post-trial conference was held on April 25, 2006, at which the Trustee and counsel

for the Debtor appeared telephonically and were heard. The trial record was closed and this

matter was submitted for decision.

B.      <u>Factual Background</u>

The Debtor's Petition lists assets of $23,720 consisting of $20 cash on hand, $500 in a

checking account, household goods of $1,500, wearing apparel of $1,500, $20,000 in an IRA

account, and $200 in Disney stock. Petition, Schedule B. The Debtor claims that the funds in her

---

[1] References to "Trial Tr." are to the transcript of the trial held on June 15, 2005.

checking account, her household goods, her wearing apparel, and her IRA account, are exempt property. Petition, Schedule C. The Debtor does not list any secured debt, and lists unsecured debt of $30,043.71, comprised primarily of credit card debt and telephone and utility debt. Petition, Schedules D, F.

The Debtor completed about two years of college but has not earned a degree. Trial Tr. at 9:12-19. She has been employed as a paraprofessional by the New York City Department of Education for eight years, and lists total monthly income of $1,523 and total monthly expenses of $1,470. Petition, Schedules I, J. The Debtor's Statement of Financial Affairs shows employment income of $21,000 in 2003, $1,500 in 2002, and $18,000 in 2001. Statement of Financial Affairs ("SOFA"), item 1. The Debtor's 2003 Federal income tax return shows total income in 2003 of $82,824, including $19,124 in wages, a $31,435 IRA distribution, and a $31,250 pension distribution. Debtor's Exh. D (2003 Federal income tax return). The Debtor states in her Statement of Financial Affairs that no financial accounts or instruments were closed, sold, or otherwise transferred within one year of the Petition Date. SOFA, item 11.

The Debtor's Statement of Financial Affairs shows that for the two years prior to the Petition Date, she had no income other than from "employment or operation of business." SOFA, item 2. The Statement of Financial Affairs also shows that she was an "officer, director, partner, or managing executive of a corporation, partnership, sole proprietorship" called Gentle Ferocity, a cleaning business, from 2001 to 2003. SOFA, item 18A. As to the business activities of Gentle Ferocity, the Debtor testified that "[t]he business never existed. All we had was a tax ID." Trial Tr. at 12:13-14.

From 1981 to 2003, the Debtor resided in and was the sole owner of a one-family home

4

located at 1863 East 33rd Street, Brooklyn, New York (the "East 33rd Street Property").  SOFA,

item 15; Plaintiff's Exh. 7 (transcript of May 13 Section 341 Meeting) at 3:11-24.  About six and

one-half months before the Petition Date, on September 22, 2003, the Debtor sold the East 33rd

Street Property for $390,000.  Debtor's Exh. C (closing statement for East 33rd Street Property

sale.)  On July 8, 2003, the Debtor's real estate attorney, Raymond L. Ferrier, received a $39,000

down payment from the prospective purchasers.  Joint Pre-Trial Statement, Undisputed Facts, at

2.  The closing statement shows that the Debtor attended the closing on September 22, 2003, and

that the net proceeds of the sale of the East 33rd Street Property were approximately $78,000 (the

"Sale Proceeds").  Debtor's Exh. C (closing statement for East 33rd Street Property sale.)

At the May 13 Section 341 Meeting, the Debtor testified that she and her children had

been threatened by an individual, Thih Anderson, who forced her to enter into four mortgages

secured by the East 33rd Street Property and who arranged for the sale of the East 33rd Street

Property when mortgagees took steps to foreclose.  Plaintiff's Exh. 7 (transcript of May 13

Section 341 Meeting) at 5:23-11:12.  At the May 13 Section 341 Meeting, the Trustee's attorney

requested that the Debtor produce all documents relating to the sale of the East 33rd Street

Property.  Plaintiff's Exh. 7 (transcript of May 13 Section 341 Meeting) at 12:23-13:14.  In

response, the Debtor produced the closing statement, described by the Debtor's attorney as "the

only document [the Debtor] can locate," and "documents from the ACRIS system, which

confirms the mortgages . . ."  Debtor's Exh. C (May 17, 2004, letter from the Debtor's attorney to

the Trustee).[2]

---

[2]  The Automated City Registration Information System ("ACRIS") provides online
property records information from the New York City Department of Finance, Office of the City
Register, and shows that as of May 17, 2004, there were four mortgages on the East 33rd Street

At the July 7 Section 341 Meeting, the Debtor was examined by Diana Adams of the Office of the United States Trustee and the Trustee. By Stipulation and Order so-ordered by this Court on July 13, 2004 (the "July 13 Stipulation and Order"), the Debtor was directed to produce all documents relating to the closing of the sale of the East 33rd Street Property, two recent pay stubs, bank statements for the two years prior to the Petition Date, tax returns for 2002 and 2003, and the two most recent statements from any IRA, 401(k), or 403(b) accounts held by her or on her behalf, by August 16, 2004. July 13 Stipulation and Order, Docket No. 10. The Debtor was also directed to appear for examination on September 8, 2004. *Id*.

On August 11, 2004, the Debtor produced some but not all of the requested documents. The Debtor produced information relating to the sale of the East 33rd Street Property including a contract of sale dated July 8, 2003, between the Debtor and the purchasers; New York City transfer tax returns and a New York State real property transfer report; a possession agreement between the Debtor and the Purchasers dated September 22, 2003, providing for the Debtor to remain in possession of the East 33rd Street Property after the closing; a letter dated November 20, 2003, from Raymond Ferrier, the Debtor's real estate attorney, to Jeffrey Mehl, the purchasers' attorney, confirming that the Debtor tendered possession of the East 33rd Street Property and that $2,415 was due to the purchasers; a letter dated December 3, 2003, from Mr.

---

Property: a $198,000 mortgage held by Mortgage Electronic Registration System, Inc.; a $46,951.39 mortgage held by Household Finance Realty Corporation of New York; a $110,400 mortgage held by Champion Mortgage Co., Inc.; and a $41,050.98 mortgage held by Household Finance Realty Corporation of New York. The closing statement for the sale of the East 33rd Street Property shows that two mortgages were satisfied at the September 22, 2003, closing. These were a $228,000 mortgage held by Mortgage Electronic Registration System, Inc., and a $53,242.12 mortgage held by Household Finance Realty Corporation of New York.

Ferrier to Mr. Mehl transmitting a check for $2,415 in satisfaction of the possession agreement and a copy of the $2,415 check; a copy of the deed transferring title to the East 33rd Street Property from the Debtor to the purchasers on September 22, 2003; and the HUD-1 settlement statement. Debtor's Exh. D.

The Debtor produced financial information including two employee pay statements from the City of New York for June 2004; monthly Independence Community Bank Checking Account Bank Statements for the period December 2003 to July 2004; and Federal and New York State income tax returns for 2002 and 2003. *Id.* The Debtor also produced documents relating to her pension and IRA accounts including a Mount Sinai Medical Center 403(b) Retirement Plan Statement showing a balance as of December 31, 2003, of $26,128.78, and a Sun Life Financial Transaction Confirmation showing full surrender on October 1, 2003, of the Debtor's IRA account with a balance of $21,064.77. *Id.* Finally, the Debtor produced a letter dated August 3, 2004, to her attorney in which she describes the personal and financial circumstances that caused her bankruptcy filing. *Id.*

The Debtor appeared for continued examination at the Section 341 meeting on September 8, 2004. The Trustee questioned the Debtor about the disposition of the Sale Proceeds and the $62,682 IRA and pension distributions. The Debtor testified that she used some of these funds to pay her son's university tuition. Plaintiff's Exh. 8 (transcript of September 8 Section 341 Meeting) at 3:4-13. The Trustee adjourned the Section 341 meeting to allow the Debtor time to obtain receipts showing these payments and "any other receipts and documents showing what happened to the money that was received from the closing, and from the IRA and annuity . . . ." Plaintiff's Exh. 8 (transcript of September 8 Section 341 Meeting) at 5:12-19.

7

By letter dated April 21, 2005, the Debtor produced university tuition statements showing payments for the Debtor's son for the Fall and Spring 2002, Fall and Spring 2003, and Fall and Spring 2004 semesters.  Debtor's Exh. B.  The statements show two payments by check totaling $1,200 for the Fall 2002 semester, a payment by check for $2,995 for the Spring 2002 semester, two payments by check totaling $7,127.49 for the Fall 2003 semester, four payments by check and cash totaling $12,948.80 for the Spring 2003 semester, one payment by check for $2,800 for the Fall 2004 semester, and one payment by check in the amount of $6,160.50 for the Spring 2004 semester.  *Id*.  The statements do not show when or by whom these payments were made.  *Id*.

The Debtor did not produce any other bank statements, cancelled checks, receipts, or other documents showing the receipt and disposition of the Sale Proceeds and the funds withdrawn from the Debtor's IRA and pension accounts.  Also, the Debtor did not provide any other written accounting of the receipt and disposition of the Sale Proceeds or the funds withdrawn from the Debtor's IRA and pension accounts.

The Trustee argues that based on these facts, and in particular the Debtor's failure to produce documents relating to her receipt and disposition of the Sale Proceeds and the IRA and pension withdrawals totaling approximately $140,000, the Debtor is not entitled to a bankruptcy discharge under Sections 727(a)(3), 727(a)(4)(D), and 727(a)(5).

**Discussion**

A.    Overview

This Court and others have observed that "'Chapter 7 of the Bankruptcy Code . . . affords powerful relief to individuals saddled with oppressive debt by granting honest debtors a discharge from their dischargeable debts.'"  *Ochs v. Nemes (In re Nemes)*, 323 B.R. 316, 323 (Bankr.

8

E.D.N.Y. 2005) (quoting *Jacobowitz v. The Cadle Co. (In re Jacobowitz),* 309 B.R. 429, 435 (S.D.N.Y. 2004)).  "Such relief, however, is a privilege, not a right, and should only inure to the benefit of the 'honest but unfortunate debtor.'"  *Christy v. Kowalski (In re Kowalski),* 316 B.R. 596, 601 (Bankr. E.D.N.Y. 2004) (quoting *Krohn v. Frommann (In re Frommann)*, 153 B.R. 113, 116 (Bankr. E.D.N.Y. 1993)).  *See also Local Loan Co. v. Hunt,* 292 U.S. 234, 244 (1934) (Bankruptcy Code serves the public and private purpose of offering the "honest but unfortunate debtor . . . a new opportunity in life and a clear field for future effort, unhampered by the pressure and discouragement of pre-existing debt.").

Recognizing that denial of a discharge is an extreme penalty, the Second Circuit Court of Appeals has instructed that objections to a debtor's discharge under Section 727 of the Bankruptcy Code "must be construed strictly against those who object to the debtor's discharge and 'liberally in favor of the bankrupt.'"  *State Bank of India v. Chalasani (In re Chalasani),* 92 F.3d 1300, 1310 (2d Cir. 1996) (citation omitted).  *See also Sterling Int'l, Inc. v. Thomas (In re Thomas)*, 2003 WL 21981707, *6 (Bankr. D. Idaho July 17, 2003) ("This accepted standard recognizes that loss of discharge is one of the most substantial sanctions that can be levied by [the] Court.").

In keeping with the principle that objections to discharge under Section 727(a) are construed liberally in favor of the debtor, Rule 4005 of the Federal Rules of Bankruptcy Procedure provides that the objecting creditor bears the burden of proof in an objection to a debtor's discharge.  Fed. R. Bankr. P. 4005.  And the objecting creditor bears this burden of proof by a preponderance of the evidence.  *See Grogan v. Garner*, 498 U.S. 279, 289-91 (1991) (finding that the appropriate standard of proof in Section 523(a) actions is by a preponderance of the

evidence and suggesting that it is the same under Section 727).

The Trustee objects to the Debtor's discharge under Section 727(a)(3) on grounds that the Debtor concealed, or failed to keep or preserve, recorded information; under Section 727(a)(4)(D) on grounds that the Debtor knowingly withheld from the Trustee, an officer of the estate, the books and records relating to the Debtor's property and financial affairs; and under Section 727(a)(5) on grounds that the Debtor failed satisfactorily to explain losses of assets and the deficiency of assets to meet her liabilities.  If the Trustee succeeds under any one of these provisions, then the Debtor's discharge will be denied.

B.     <u>The Third Claim for Relief - Denial of the Debtor's Discharge Under Section 727(a)(3)</u>

Section 727(a)(3) of the Bankruptcy Code provides that a debtor's discharge should be denied if:

> the debtor has concealed, destroyed, mutilated, falsified, or failed to keep or preserve any recorded information, including books, documents, records, and papers, from which the debtor's financial condition or business transactions might be ascertained, unless such act or failure to act was justified under all of the circumstances of the case.

11 U.S.C. § 727(a)(3).

Courts have recognized that "[t]he purpose of section 727(a)(3) is to give creditors and the bankruptcy court complete and accurate information concerning the status of the debtor's affairs and to test the completeness of the disclosure requisite to a discharge." *Meridian Bank v. Alten*, 958 F.2d 1226, 1230 (3d Cir. 1992).  *See also In re Nemes,* 323 B.R. at 323; *Baron v. Klutchko (In re Klutchko),* 338 B.R. 554, 572 (Bankr. S.D.N.Y. 2005); *Sackett v. Shahid (In re Shahid)*, 334 B.R. 698, 706 (Bankr. N.D. Fla. 2005).

The Second Circuit Court of Appeals described the standard for assessing the adequacy of

a debtor's disclosure and record-keeping in *In re Underhill*, 82 F.2d 258 (2d Cir.), *cert. denied*,

299 U.S. 546 (1936):

> The law . . . does not require that [the debtor's books and records] . . . be kept in any special form of accounts. It is a question in each instance of reasonableness in the particular circumstances. Complete disclosure is in every case a condition precedent to the granting of a discharge, and if such disclosure is not possible, without the keeping of books and records, then the absence of such amounts to that failure to which the act applies.

*In re Underhill*, 82 F.2d at 259-60. *See also In re Halpern*, 387 F.2d 312, 315 (2d Cir. 1968).

The bankruptcy court has broad discretion to determine whether the records kept by a

debtor are adequate. *See Goff v. Russell Co. (In re Goff)*, 495 F.2d 199, 202 (5th Cir. 1974).

Courts look to many factors to assess "reasonableness in the particular circumstances" of the

debtor, including:

1. Whether the debtor was engaged in business, and if so, the complexity and volume of the business;
2. The amount of the debtor's obligations;
3. Whether the debtor's failure to keep or preserve books and records was due to the debtor's fault;
4. The debtor's education, business experience and sophistication;
5. The customary business practices for record keeping in the debtor's type of business;
6. The degree of accuracy disclosed by the debtor's existing books and records;
7. The extent of any egregious conduct on the debtor's part; and
8. The debtor's courtroom demeanor.

*State Bank of India v. Sethi (In re Sethi)*, 250 B.R. 831, 838 (Bankr. E.D.N.Y. 2000).

With respect to a consumer debtor, the court in *Structured Asset Services v. Self (In re*

*Self)*, 325 B.R. 224 (Bankr. N.D. Ill. 2005), noted that "[w]hile [Section 727(a)(3)] was not

meant to bar the discharge of the ordinary consumer debtor, . . . a 'sudden and large dissipation of

assets,' coupled with a lack of books and records will provide a basis for denial of discharge

under this section." *In re Self*, 325 B.R. at 240 (quoting *PNC Bank v. Buzzelli (In re Buzzelli)*,

246 B.R. 75, 98 (Bankr. W.D. Pa. 2000)).

<u>*Whether the Debtor kept adequate records.*</u>

The Trustee's Third Claim for Relief for denial of the Debtor's discharge pursuant to 11

U.S.C. § 727(a)(3) is based upon his allegation that:

> Despite [the] Trustee's demands upon Debtor and Debtor's attorney for the books
> and records of the Debtor, no books and records have been turned over to the
> Trustee showing the receipt and disposition of the [proceeds of the sale of the
> East 33rd Street Property of approximately $78,000, and the funds received from
> the Debtor's withdrawal of her IRA and pension accounts in the amount of
> $62,585].

Complaint ¶ 23.

Under Section 727(a)(3), the objecting party bears the burden of showing the inadequacy

of the debtor's records to ascertain his or her financial condition. Fed. R. Bankr. P. 4005. *See*

*Wazeter v. Michigan Nat'l Bank (In re Wazeter),* 209 B.R. 222, 227 (W.D. Mich. 1997).

Accordingly, the Trustee must show: "(1) that the [D]ebtor failed to keep or preserve adequate

records; and (2) 'that such failure makes it impossible to ascertain the [Debtor's] financial

condition and material business transactions.'" *In re Jacobowitz*, 309 B.R. at 436 (quoting

*Meridian Bank*, 958 F.2d at 1232)).  It is not necessary for the Trustee to show that the Debtor

willfully concealed or destroyed her records, as intent is not a necessary element of an objection

to discharge under Section 727(a)(3).  *In re Kowalski*, 316 B.R. at 602.  If the Trustee meets his

burden of showing that the Debtor's records are insufficient to ascertain her financial condition

and business transactions, then the burden shifts to the Debtor to produce "'additional credible

evidence to rebut the proof of insufficient records, or to justify the absence of records.'" *Thaler v.*

*Erdheim (In re Erdheim)*, 197 B.R. 23, 29 (Bankr. E.D.N.Y. 1996) (quoting *United States Fid. &*

12

*Guar. v. Delancey (In re Delancey)*, 58 B.R. 762, 767-68 (Bankr. S.D.N.Y. 1986)).

The record reflects that the Trustee sought production from the Debtor of documents relating to the receipt and disposition of the Sale Proceeds and the funds withdrawn from the Debtor's IRA and pension accounts. With respect to the Sale Proceeds, the Debtor produced copies of the closing statement, the contract of sale, New York City and New York State property transfer reports, the deed, the possession agreement between the Debtor and the purchasers, letters dated November 20, 2003, and December 3, 2003, confirming that the Debtor tendered possession of the East 33rd Street Property, that $2,415 was due and paid to the purchasers, and the HUD-1 settlement statement. Debtor's Exhs. C and D. These documents show that the Debtor attended the closing on September 22, 2003, and that as seller, she was entitled to approximately $78,000 in Sale Proceeds. Debtor's Exh. D.

The record also shows that the Debtor did not produce documents showing the receipt and disposition of the Sale Proceeds and that when questioned, the Debtor responded with a measure of uncertainty. For example, at the June 15 Trial, the Debtor testified:

> Q     At the closing of sale, isn't it true that you received a check for the net proceeds of at least $40,000?
> A     No, it is not.
> Q     You did sign the Settlement Statement which indicates that you were to receive that money, is that not correct?
> A     That is my signature.
> Q     In addition to that on the Settlement Statement, it refers to line 201, a $39,000 down payment, is that correct?
> A     That is what it says. I don't understand what it is.
> . . .
> Q     Do you recall who attended the closing? Were you there alone as the seller?
> . . .
> A     Yes.
> Q     Do you recall that you were asked to provide a written accounting of the monies received from the closing in lieu of documents, at least a written

account?

A      If you had asked me, I gave everything I had to Mr. Siegel [Debtor's attorney].  I have nothing.

Trial Tr. at 19:15-21:22.

With respect to the funds withdrawn from her IRA and pension accounts, the Debtor produced her Federal and New York State income tax returns for 2002 and 2003.  Debtor's Exh. D.  The Debtor's 2003 Federal income tax return shows that the Debtor received additional income of $62,685 in withdrawals from her IRA and pension accounts.  The Debtor also produced some but not all of the bank statements requested by the Trustee.  Specifically, the Debtor produced bank statements for December 2003 to July 2004, but did not produce bank statements for April 2003 to November 2003.  *Id.*  These bank statements do not reflect deposits or withdrawals corresponding to the $140,000 in additional income received by the Debtor in 2003.  The Debtor also produced university tuition statements showing cash and check payments totaling approximately $34,000 for the Debtor's son for 2002, 2003, and 2004.  Debtor's Exh. B.

The Court finds that the documents produced by the Debtor do not permit the Trustee to determine the Debtor's financial condition with completeness and accuracy.  The bank statements do not include statements for eight months in 2003.  They do not show receipt or the disposition of the $78,000 in Sale Proceeds and some $62,000 in funds withdrawn from the Debtor's IRA and pension accounts.  The university tuition statements confirm that payments were made for the Debtor's son, but do not show when or by whom they were made.

For these reasons and based on the entire record, the Court finds that the documents produced by the Debtor do not enable the Trustee to ascertain the Debtor's financial condition prior to her filing bankruptcy, and in particular do not provide sufficient information for the

14

Trustee to determine the disposition of the Sale Proceeds and the funds withdrawn from the

Debtor's IRA and pension accounts.

_Whether the Debtor's failure to keep adequate records was justified._

Once the Trustee meets the initial burden of demonstrating that the Debtor failed to keep

or preserve adequate records from which her financial condition may be ascertained, the burden

shifts to the Debtor to show that her failure to keep such records was justified. *See In re

Jacobowitz*, 309 B.R. at 438; *Casa Invs. Co. v. Brenes (In re Brenes)*, 261 B.R. 322, 330 (Bankr.

D. Conn. 2001).

Section 727(a)(3) "does not specify what constitutes justification for maintaining

inadequate records; instead it requires the trier of fact to make a determination based on all the

circumstances of the case." *Meridian Bank*, 958 F.2d at 1231.  The Second Circuit Court of

Appeals described the standard for whether a debtor has shown justification in *In re Sandow*, 151

F.2d 807 (2d Cir. 1945) (applying Section 14(2) of the Bankruptcy Act).  The court stated:

> If [the debtor's transactions] were such that others in like circumstances would
> ordinarily keep financial records [then the debtor] must show more than that [she]
> did not comprehend the need for them and must carry [her] explanation by way of
> justification to the point where it reasonably appears that because of unusual
> circumstances [she] was under no duty to keep them.

*In re Sandow,* 151 F.2d at 809.  *See also Lansdowne v. Cox (In re Cox)*, 41 F.3d 1294, 1297 (9th

Cir. 1994) (citing *In re Sandow* and observing that the "justification must indicate that because of

unusual circumstances, the debtor was absolved from the duty to maintain records herself.")

"[W]hether the debtor's failure to keep records was justified must be determined in light

of all the circumstances of the case." *In re Kowalski*, 316 B.R. at 603.  Courts have generally

looked to several factors to determine whether a debtor has shown justification for a failure to

15

maintain adequate records.  In a business context, the Third Circuit Court of Appeals found:

> "The issue of justification depends largely on what a normal, reasonable person would do under similar circumstances.  The inquiry should include the education, experience and sophistication of the debtor; the volume of the debtor's business; the complexity of the debtor's business; the amount of credit extended to debtor in his business; and any other circumstances that should be considered in the interest of justice."

*Meridian Bank*, 958 F.2d at 1231 (quoting *In re Wilson*, 33 B.R. 689, 692 (Bankr. M.D. Ga. 1983)).

In *In re Nemes*, a consumer case, this Court observed that "[c]ourts have found justification where the debtor's records were lost as the result of circumstances beyond the debtor's control, including 'an outside or destructive force' such as robbery or fire."[3]  *In re Nemes*, 323 B.R. at 327 (quoting *Anderson v. Wiess (In re Wiess)*, 132 B.R. 588, 592 (Bankr. E.D. Ark. 1991).  And "[c]ourts have also found justification where a combination of factors, including the debtor's personal situation and circumstances beyond the debtor's control, led to the failure to preserve records."[4]  *In re Nemes*, 323 B.R. at 327 (citing cases).

---

[3]  *See, e.g.*, *G&J Invs. v. Zell (In re Zell)*, 108 B.R. 615, 628 (Bankr. S.D. Ohio 1989) (finding justification where the debtor's business office was vandalized, her records were stolen, and her computer was destroyed); *Ford Motor Credit Co. v. Branch (In re Branch)*, 54 B.R. 211, 214-15 (Bankr. D. Colo. 1985) (finding justification where the debtor's records were lost in a fire); *Fox v. Cohen (In re Cohen)*, 47 B.R. 871, 875 (Bankr. S.D. Fla. 1985) (finding justification where robberies, vandalism, and a fire occurred where the debtor's personal records were stored).

[4]  *See, e.g.*, *Strzesynski v. Devaul (In re Devaul)*, 318 B.R. 824, 838 (Bankr. N.D. Ohio 2004) (finding justification based on debtor's limited education, dependence on others to assist him, and the disposal of the documents by a friend to whom he turned for assistance); *Hutzelman v. Luhman (In re Luhman)*, 146 B.R. 163, 166 (Bankr. W.D. Pa. 1992) (finding justification where debtor had a history of drug addiction and "satisfactorily explained the use of funds" and "adequately explained any loss of assets or deficiency of assets to meet [his] liabilities"); *Cox v. Landsdowne (In re Cox)*, 904 F.2d 1399, 1403 (9th Cir. 1996) (remanding to bankruptcy court to consider one spouse's reliance on the other spouse to maintain records in determining whether

By contrast, as noted by the court in *In re Brenes*, "[u]nder most circumstances, intentional neglect, or total indifference, to the responsibility to keep complete and detailed records, compute against a debtor in the Section 727(a)(3) calculus." *In re Brenes*, 261 B.R. at 333.

The Debtor argues that her failure to keep adequate records is justified under the circumstances because she was the victim of physical and emotional domestic abuse. In a letter dated August 3, 2004, to her attorney, the Debtor describes the personal and financial circumstances leading to her bankruptcy filing. The Debtor states:

> In my opinion I am a victim of an extortionist. . . . [In 2001, Thih Anderson] convinced me to start a business named Gentle Ferocity . . . and I was named sole proprietor . . . . Thih Anderson applied for four mortgages on [the East 33rd Street Property] . . . The money received from those four mortgages was deposited into the entity Gentle Ferocity. He then seized complete control of the money and Gentle Ferocity.
>
> During this time I became very fearful of Thih Anderson. I was intimidated by his physical strength, abusive language and his threats. Thih Anderson is a black belt in karate, he carries a gun, and has three attack dogs . . . . Thih Anderson made me a prisoner in my own home. I lived in fear everyday.
>
> I am aware of two people who assisted Thih Anderson in what I believe was a scheme to steal from me. The scheme included the four mortgages on my house, maxing out my credit cards, my bank account, my children's bank accounts, misusing our identity and our social security numbers. Since I had no control of my financial capital I was unable to pay any of my normal basic household expenses, such as utilities, insurance, etc. I was also unaware to what extent he would use my children and my identity and our social security numbers. Till this day I still live in fear knowing that he has my family identity and our social security numbers. I am terrified knowing that he can locate us in the future. . . . I tried very hard to seek help. . . . I have had established credit for over 25 years and I never was in debt. But within about a year and a half I lost everything including my house by the working of one person who deliberately embezzled me. . . . I was scared of everything and everyone. Total hopelessness had

_____

the debtor's failure to keep sufficient records was justified).

overcome me.  We were about to become homeless.  All I needed to do at this point was to secure some kind of home for my children and me.  Knowing the situation that I was in, I no longer had any kind of credit and I earn a low income.  The only thing that concerns me is to secure my children so that they can have some sort of normalcy in their life.  I was only trying to survive an unbearable situation so my children could go on with their lives.

I am hoping to receive help from [the] Bankruptcy Court to resolve my financial situation so that I can finally have closure.

Debtor's Exh. D (August 3, 2004, letter from the Debtor to her attorney).

At trial, the Debtor confirmed the account set forth in her August 3, 2004, letter to her attorney:

Q    At the time you met Mr. Anderson, did you have any debt?
A    Never.  I never owed anybody anything.
Q    All the debt that is listed on the petition was incurred after meeting Mr. Anderson?
A    100 percent of it.
. . .
Q    What goods and services were purchased with the debts that were listed on your bankruptcy petition? . . . For example, [on] Bankruptcy Petition Schedule F you listed debts to American Express for about $8,000.  Do you know how that was incurred?
A    Thih Anderson did that.  We lost all our bank accounts, our savings.  We lost everything.  Everything he did.  This is his doing.
Q    How can Mr. Anderson make you take out mortgages and take out debt?
A    Besides the fact that he had three attack dogs that followed his command, he carries a gun.  He had other people work with him.  He is a lot bigger than me.  He is a black belt in karate.  He always threatened me and my kids.  There was physical abuse.  There was a lot of mental abuse.
. . .
Q    . . . Of all the money that was taken with these mortgage loans, did you receive any of it or did Mr. Anderson receive it?
A    We had nothing.  We had no phone, no electricity.  We had nothing.  I lost my car.  I lost everything.  I almost lost my job.  He tried to take my kids from me. . . . I was victimized.  I tried to get help and nobody would help.

Trial Tr. at 30:7-31:23.

The Debtor's testimony was corroborated by the expert testimony and report of Laura

Boyd, MSW.  Ms. Boyd completed a Master's degree in social work at Columbia University,

School of Social Work, and works at Sanctuary for Families as a domestic violence social worker.

Trial Tr. at 56:11-25.  Sanctuary for Families provides safety and support services to victims of

domestic abuse.  Debtor's Exh. A (Expert Report).  Ms. Boyd qualified as an expert in the area of

domestic violence counseling without objection by the Trustee.  Trial Tr. at 57:4-9.  Her expert

report dated April 12, 2005 (the "Expert Report"), was also received in evidence without

objection.  Trial Tr. at 58:20-59:8.

Ms. Boyd described the impact of domestic abuse on a victim's economic circumstances:

> It is quite common in our experience with survivors of domestic violence that they are often coerced and controlled via economic abuse.  Our clients have often been threatened to either provide money for the abuser or have had money withheld from them for purposes of power and control.  Abusers often command the victims' professional choices, income, personal expenditures, and finances to further control the victim's life.  Without adequate finances, the victims are then further controlled by the abuser via their need for basic survival items and fear of what will happen if they choose not to comply with the abusers' demands.  In turn, the abusers' control of finances often effects the victims' actions, choices, children, and future goals.

Debtor's Exh. A (Expert Report).

As to the Debtor, Ms. Boyd stated:

> It seems quite apparent to me that [the Debtor] is a victim of domestic violence and that her financial situation should be understood through this perspective.  Our understanding at Sanctuary for Families of Ms. Young's current state of bankruptcy is that it is due to financial abuse committed against her by her abusive partner.  According to our understanding of Ms. Young's situation, she was threatened to provide finances for the abuser as well as establish credit in her name for his purposes.  Due to the batterer's financial abuse of this client, she was left with little money and has had to drastically alter her lifestyle and that of her children to live under their new economic circumstances.

*Id.*

At the June 15 Trial, Ms. Boyd described a domestic abuse victim's lack of control over

her financial transactions:

> Q    In your experience counseling people who are victims of domestic violence and abuse, what do you find considering the issue of the abused victim to be in control of and knowledgeable about their financial transactions?
>
> A    . . . If there is fear and intimidation, if there are threats, threats of taking children, threats to one's children, threats to one's personal safety, physical safety or emotional safety, there can be psychological control, it is quite common that we see this in our agency, that people are no longer able to control their finances because their abuser coerces them and controls them.  In other words, almost stealing the money that is in the victim's hands.

Trial Tr. at 59:9-60:3.

Ms. Boyd also explained the circumstances that lead a domestic abuse victim to fail to

maintain books and records:

> Q    How about books and records, do you find that it is the case that people when they move or flee from the site of violence that they retain the records or don't retain them?  How does that generally work?
>
> A    Quite often if someone is fleeing with the fear for their life, for their children's life, then they do often leave things behind.  There is a great deal of chaos when it comes to a traumatizing situation.

Trial Tr. at 60:17-25.

Ms. Boyd further testified as to the reasons why a domestic abuse victim would not be

able to trace her financial transactions:

> Q    For example, the Trustee talked about how it is inconceivable to him that one could not provide a written account of disbursements at a real estate closing.  Could you explain if that is the kind of symptom that you often find with victims of domestic violence?
>
> A    That is a common symptom.  When someone is going through a traumatic experience in a domestic violence situation, there is great fear.  During that fear, it is quite common that someone would not be able to provide accurate information and would not be able to follow where their finances are if it is being controlled by the batterer.

Trial Tr. at 60:4-16.

With respect to the Debtor, Ms. Boyd testified:

Q    When did you first meet Ms. Young?
A    The middle of March 2005.
Q    Have you been offering counseling service to Ms. Young since that time?
A    Yes, I have been.
Q    Could you very briefly explain the nature of the services that you have been providing?
A    Ms. Young and I meet on Tuesday afternoons once a week for about between an hour and an hour and a half.

Trial Tr. at 58:1-11. Ms. Boyd gave her expert opinion that the Debtor was a victim of domestic violence and abuse, and that the Debtor's reaction to her situation was consistent with the pattern seen in other domestic violence and abuse situations. Trial Tr. at 61:2-9.

Ms. Boyd provided her expert opinion as to the reasons for the Debtor's failure to provide to the Trustee books and records showing the receipt and disposition of the Sale Proceeds and the funds withdrawn from her IRA and pension accounts. She testified:

Q    Based upon hearing the Trustee's testimony and your understanding of his demands on [the Debtor] and based upon your counseling with [the Debtor], do you believe that it is understandable and reasonable for [the Debtor] not to have been able to comply with those demands?
A    Yes, I do.
. . .
Q    . . . Have you formed an opinion based on your expertise as to the reasons why the [D]ebtor . . . did not have or has indicated that she does not have some of the documents and information requested by the Trustee? You can answer that question yes or no. Have you formed your own opinion?
A    Yes.
Q    What is your opinion?
A    My opinion is that due to the trauma of the situation, she was very fearful of her life and her children's safety at that time and therefore was unable to control her finances due to intimidation and threats by her abusive partner.
Q    Can you describe as completely as possible the basis for your opinion?
. . .
A    As fully as possible, from my counseling appointments with [the Debtor] since the middle of March, we have discussed in detail the abuse that she has endured since I believe the year 2000 when she met this man. Due to that, she has lived to my understanding in great fear of the ability of this

man to hurt her and her children and therefore has lost a great deal of
control over what she is able to do and in this case of her finances at that
time due to threats that he had made.

Trial Tr. at 62:10-64:3.

The Court finds that the record does not establish that the Debtor intentionally neglected

or acted with total indifference to proper record keeping. *See In re Brenes*, 261 B.R. at 333.

Nor does the record show that the Debtor engaged in other egregious conduct. Rather, the

record shows that the Debtor's conduct was affected by an extrinsic and destructive force in the

form of the physical and emotional domestic abuse that she experienced and her resulting fear

for her safety and the safety of her children.

The Court also had the opportunity to observe the Debtor's demeanor as a witness and

finds that the Debtor testified credibly, reasonably, and in good faith that she was a victim of

physical and emotional domestic abuse, and that this abuse led her to lose control over her

financial circumstances, including her ability to retain financial records. That is, the Debtor

was subject to circumstances beyond her control akin to "'an outside or destructive force' such

as robbery or fire." *In re Nemes*, 323 B.R. at 327, *quoting In re Wiess*, 132 B.R. at 592. The

Court is satisfied that the domestic abuse experienced by this Debtor constitutes "unusual

circumstances [so that the Debtor] was under no duty to keep them." *In re Sandow*, 151 F.2d at

809. The Debtor's testimony was corroborated by the expert testimony and report of Ms. Boyd,

and this expert evidence was unrebutted by the Trustee.k

For these reasons and based on the entire record, the Court finds that the Debtor has

showed that under all of the circumstances of her case, she was justified in not keeping or

preserving adequate records. Accordingly, the Trustee's objection to the Debtor's discharge

under 11 U.S.C. § 727(a)(3) is denied.

C.   The Fourth Claim for Relief - Denial of the Debtor's Discharge Under Section
      727(a)(4)(D)

    Section 727(a)(4)(D) of the Bankruptcy Code provides that a debtor's discharge should

be denied if "the debtor knowingly and fraudulently, . . . withheld from an officer of the estate

entitled to possession . . . any recorded information, including books, documents, records, and

papers, relating to the debtor's property or financial affairs."  11 U.S.C. § 727(a)(4)(D).

    A debtor is under an affirmative duty to "surrender to the trustee all property of the

estate and any recorded information, including books, documents, records, and papers, relating

to property of the estate . . . ."  11 U.S.C. § 521(4).  As noted by one court, "Section

727(a)(4)(D) enforces this obligation by denying discharge to debtors who intentionally

withhold records, books, documents, or other papers relating to their property or financial

affairs."  *Clark v. Tieszen (In re Tieszen)*, 1999 WL 669263, at *7 (Bankr. N.D. Ill. Aug. 24,

1999).

    To establish grounds for denial of discharge under Section 727(a)(4)(D), the objecting

party must show that the debtor withheld from an officer of the estate recorded information

relating to the debtor's property or financial affairs, and that the debtor did so "knowingly and

fraudulently."  11 U.S.C. § 727(a)(4)(D).  That is:

> The intent required under [Section 727(a)(4)(D)] must be actual, as distinguished
> from constructive, intent.  *Bank of Pa. v. Adlman (In re Adlman)*, 541 F.2d 999,
> 1003 (2d Cir. 1976).  Because actual intent is difficult to prove directly, it may be
> established from circumstantial evidence or inferred from the debtor's conduct.

*Gold v. Guttman (In re Guttman)*, 237 B.R. 643, 647 (Bankr. E.D. Mich. 1999).  *See also In re*

*Tieszen*, 1999 WL 669263 at *7.

23

Courts have found the requisite intent to act "knowingly and fraudulently" was present where the debtor's conduct was evasive or persistently uncooperative.  For example, in *In re Erdheim*, the court granted summary judgment on the trustee's Section 727(a)(4)(D) claim where the debtor refused to turn over documents requested by the trustee, and stated by affidavit that he produced some of the requested documents but did not provide other support for that assertion. *In re Erdheim*, 197 B.R. at 29.  In *Rafoth v. Chimento (In re Chimento)*, 43 B.R. 401 (Bankr. N.D. Ohio 1981), the court denied the debtor's discharge under Section 727(a)(4)(D) where the debtor withheld financial information from the trustee after numerous requests.  *In re Chimento*, 43 B.R. at 403.  And in *In re Robson*, 154 B.R. 536 (Bankr. E.D. Ark. 1993), the court denied the debtors' discharge where the debtors failed to comply with an order directing production to the trustee of certain documents and offered no explanation for their failure to turn over the documents.  *In re Robson*, 154 B.R. at 540.

By contrast, courts have found that the requisite intent to act "knowingly and fraudulently" was absent where the records were unavailable through no fault of the debtor.  For example, in *Ray v. Graham (In re Graham)*, 111 B.R. 801 (Bankr. E.D. Ark. 1990), the court found that the trustee did not meet his burden under Section 727(a)(4)(D) where the records sought by the trustee were either unavailable due to action of another, or neither prepared nor kept by the debtor.  *In re Graham*, 111 B.R. at 807.

Similarly, in *Dzikowski v. Chaunsey (In re Chaunsey)* 308 B.R. 97 (Bankr. S.D. Fla. 2004), *aff'd*, 2005 WL 2456223 (S.D. Fla. Mar. 31, 2005), *aff'd in part, rev'd in part*, 2006 WL 1868312 (11th Cir. July 7, 2006), the court denied the trustee's Section 727(a)(4)(D) objection to the debtor's discharge where the debtor's books and records were lost, observing:

> Although the Court finds the Debtor's explanation that she could not afford to obtain duplicate copies of her personal records implausible, there was no evidence presented to support a finding that the Debtor knowingly and fraudulently withheld her . . . financial records from the Trustee.

*In re Chaunsey*, 308 B.R. at 104.

The Trustee's Fourth Claim for Relief for denial of the Debtor's discharge pursuant to 11 U.S.C. § 727(a)(4)(D) is based upon his allegation that:

> [U]pon examination of the Debtor at the § 341 meetings held, the Trustee determined that he needed more information and documentation relating to the Debtor's property.
>
> [T]he Debtor knowingly withheld from the Trustee, an officer of the estate entitled to possession, the books and records relating to the Debtor's property and financial affairs which the Trustee duly demanded.

Complaint ¶¶ 26-27.

The Debtor was examined at three Section 341 meetings. Plaintiff's Exh. 6 (transcript of July 7 Section 341 Meeting); Plaintiff's Exh. 7 (transcript of May 13 Section 341 Meeting); Plaintiff's Exh. 8 (transcript of September 8 Section 341 Meeting). In response to the Trustee's requests, the Debtor produced documents relating to the closing of the East 33rd Street Property and the withdrawal of funds from her IRA and pension accounts. Debtor's Exhs. C and D. The documents produced by the Debtor did not show the receipt and disposition of the Sale Proceeds and the funds withdrawn from the Debtor's IRA and pension accounts.

The Trustee requested from the Debtor additional documents accounting for the receipt and disposition of the Sale Proceeds and the funds withdrawn from her IRA and pension accounts. As discussed above, the Debtor produced some but not all of the documents requested by the Trustee. *See* pp. 13-14, *supra*.

With respect to the documents that she did not produce, the Debtor testified:

Q    Why is it that you were not able to provide a full years worth of bank
     records in the manner that the Trustee had demanded?

A    When I moved, I lost 95 percent of my things.  I don't know where a lot of
     things are.  I gave you what I had.

Q    . . . Can you explain in more detail why is it that you lost 95 percent of
     your things?

A    I was victimized.  I lost my home.  We lived in the house for 20 something
     years.  We now live in a one bedroom apartment.  What was not stolen
     from us, we had to throw out or try to sell or get rid of because we could
     not possibly, physically live in such a small area.

Trial Tr. at 28:6-21.

She further testified:

Q    . . . The Trustee inferred that you should have bank statements because the
     address on the statement was your address.  What happened to the
     Independence Bank statements and the Sun Life statements that came to
     P.O. Box . . . , Brooklyn?

A    I gave you everything I had, the statements that I had.

Q    What happened to the other statements, the statements before that?

A    A lot of documents were stolen.  He took a lot of stuff.  Besides money, he
     took documents and he took a lot of material goods.

Q    When mail would come to 1863 East 33rd Street, who would take custody
     of the mail?

A    It wasn't like he had custody of the mail.  It was like he had custody of
     everything.

Q    He would ultimately take possession of the mail?

A    Of whatever he . . . pleased.

Q    How about P.O. Box . . . , who had access to that P.O. Box?

A    I did.

Q    When you got stuff from the P.O. Box, what would you do with it?

A    I would keep it.

Q    Just to help with the timeline here, is all of the documentation you
     provided the Trustee from a time after you moved from East 33rd Street in
     Brooklyn?

. . .

A    It was like everything I had.  I mean what was left of what belonged to me
     of what I had.

Q    What happened to the documentation that Mr. Anderson took?

A    I don't know.

Trial Tr. at 65:24-67:13.  That is, the Debtor testified that she provided all of the documents in

26

her possession to her counsel to be produced to the Trustee, and that any missing documents were either lost in her move or taken by Mr. Anderson.

Ms. Boyd testified that in a domestic abuse situation, it is not unusual for a victim to lose control of her personal records:

> Q How about books and records, do you find that it is the case that people when they move or flee from the site of the violence that they retain the records or don't retain them?  How does that generally work?
> A Quite often if someone is fleeing with the fear for their life, for their children's life, then they do often leave things behind.  There is a great deal of chaos when it comes to a traumatizing situation.

Trial Tr. at 60:17-25.

The Court finds that the Trustee has not shown that the Debtor "knowingly and fraudulently" withheld documents accounting for the disposition of the Sale Proceeds and the funds withdrawn from her IRA and pension accounts, or that the Debtor had the necessary actual intent to defraud her creditors or the Trustee.

The record shows that the Debtor was not evasive or persistently uncooperative with the Trustee or in the bankruptcy process.  Rather, the Debtor appeared at three Section 341 meetings and produced many documents in response to the Trustee's requests.  As to the documents that she did not produce, the Court had the opportunity to observe the Debtor's demeanor as a witness and finds that the Debtor testified credibly, reasonably, and in good faith at trial that she lost many documents when she was forced to sell and move from her home, and that other documents were stolen from her.  The record indicates that the Debtor moved from the East 33rd Street Property in November 2003, and produced bank statements beginning the following month, December 2003.  That is, the record shows that the Debtor's inability to produce the documents was not due to any fault or misconduct attributable to her.

27

The Debtor's testimony was corroborated by the expert testimony and report of Ms. Boyd. Ms. Boyd stated that victims of physical and emotional domestic abuse may not be able to provide complete information or records with respect to their financial affairs. Trial Tr. at 60:4-16. *See* pp. 20-22, *supra*. No contrary expert testimony was offered by the Trustee.

For these reasons and based on the entire record, the Court finds that the Trustee has not met his burden to show that the Debtor "knowingly and fraudulently" withheld from him recorded information relating to her property or financial affairs. Accordingly, the Trustee's objection to the Debtor's discharge under 11 U.S.C. § 727(a)(4)(D) is denied.

D.    <u>The Fifth Claim for Relief - Denial of the Debtor's Discharge Under Section 727(a)(5)</u>

Section 727(a)(5) of the Bankruptcy Code provides that "[t]he court shall grant the debtor a discharge unless . . . the debtor has failed to explain satisfactorily . . . any loss of assets or deficiency of assets to meet the debtor's liabilities." 11 U.S.C. § 727(a)(5). As courts have noted:

> "By penalizing a debtor who is insufficiently forthcoming about what happened to his assets, section 727(a)(5) is one of several Code provisions meant to relieve creditors and courts of the full burden of reconstructing the debtor's financial history and condition, placing it instead upon the debtor."

*In re Self,* 325 B.R at 250 (quoting *Cohen v. Olbur (In re Olbur)*, 314 B.R. 732, 740 (Bankr. N.D. Ill. 2004)).

Under Section 727(a)(5), the objecting party has the initial burden "of proving substantial and identifiable assets that the debtor owned at a time not too far removed from the bankruptcy that are no longer available for creditors." *In re Devaul*, 318 B.R. at 839. The objecting party is not required to establish that the debtor acted with fraudulent intent. *See Sonders v. Mezvinsky (In re Mezvinsky)*, 265 B.R. 681, 690 (Bankr. E.D. Pa. 2001); *First Am. Bank of N.Y. v.*

*Bodenstein (In re Bodenstein)*, 168 B.R. 23, 33 (Bankr. E.D.N.Y. 1994). If this initial burden is met, then the burden shifts to the debtor to provide a satisfactory explanation for the unavailability of those assets in order to receive a bankruptcy discharge. *See Bay State Milling Co. v. Martin (In re Martin)*, 141 B.R. 986, 999 (Bankr. N.D. Ill. 1992).

In assessing whether a debtor's explanation for the loss or deficiency of assets is "satisfactory," one court observed:

> What explanation will be "satisfactory" rests with the court's discretion. The debtor's account need not be "far-reaching and comprehensive," but it must be more than a "vague, indefinite, and uncorroborated hodgepodge of financial transactions." Nor does the debtor need to justify "the wisdom of the . . . disposition of assets." What matters is the "completeness and truth" of the explanation. The debtor must explain – credibly and in good faith – "what really happened to the assets in question."

*Schechter v. Hansen (In re Hansen)*, 325 B.R. 746, 763 (Bankr. N.D. Ill. 2005) (citations omitted). *See also Richardson v. Von Behren (In re Von Behren)*, 314 B.R. 169, 181 (Bankr. C.D. Ill. 2004) (finding it irrelevant whether debtor's spending was "on illegal, immoral, or otherwise imprudent activities").

Similarly, in *In re Bodenstein*, the court found:

> To be satisfactory, the explanation must convince the bankruptcy judge that a debtor has not hidden or improperly shielded assets. In this connection, the classic and still sound pronouncement was long ago formulated and stated as follows: "The word 'satisfactory' . . . may mean reasonable, or it may mean that the court, after having heard the excuse, the explanation, has the mental attitude which finds contentment in saying he believes the explanation – he believes what the bankrupts say with reference to the disappearance or the shortage. He is satisfied. He no longer wonders. He is contented."

*In re Bodenstein*, 168 B.R. at 33 (quoting *In re Shapiro & Ornish,* 37 F.2d 403, 406 (N.D. Tex. 1929), *aff'd sub nom. Shapiro & Ornish v. Holliday*, 37 F.2d 407 (5th Cir. 1930)). The court further noted that "Section 727(a)(5) does not require that the explanation be meritorious, or that

29

the loss or other disposition of assets be proper; it only requires that the explanation satisfactorily account for the disposition." *In re Bodenstein*, 168 B.R. at 33.

Whether a debtor's explanation for the loss or other disposition of assets is satisfactory does not turn on the nature of the evidence proffered by the debtor. For example, in *Krohn v. Cromer (In re Cromer)*, 214 B.R. 86 (Bankr. E.D.N.Y. 1997), the court found plausible the debtor's oral explanation that he did not list $83,500 in jewelry stored in a marina because, when he filed his petition, the marina had been seized by the parks department and he no longer had access to it. *In re Cromer*, 214 B.R. at 96. The court noted that "[t]he explanation must only satisfactorily account for the disposition of the asset; it does not have to justify that disposition as reasonable." *Id*. The court also found plausible the debtor's oral explanation that he transferred his interest in a gas station lease to the station's manager because he was losing money under the lease. *In re Cromer*, 214 B.R. at 97.

In *In re Bodenstein*, the plaintiff, a bank, questioned the disposition of certain assets listed on the debtors' personal financial statement that did not appear on their bankruptcy schedules. *In re Bodenstein*, 168 B.R. at 33. These included life insurance policies, loans to relatives and friends, jewelry, furs, and antiques. *Id*. The debtors responded that one life insurance policy was surrendered as collateral for loans and another policy had no cash surrender value. *Id*. The debtors also stated that they collected some funds due in loans to relatives and friends, and also sold their antiques, and used those funds for their daughter's wedding expenses, and additionally, that they gave their valuable fur coat as an engagement gift to their daughter. *Id*. The debtors explained that their jewelry was stolen and was not recovered by the police or covered by insurance. *Id.* The debtors did not offer documentary evidence to support their

explanation. Nevertheless, the court found the debtors' explanations to be "credible, reasonable and a good faith effort to make the explanations required by 11 U.S.C. § 727(a)(5)." *Id.*

The court also noted the existence of authority requiring documentary evidence under Section 727(a)(5) and stated:

> In this Court's view, the preferable rule would not mandate denial of discharge for failure to produce corroborating papers where the debtor's testimonial explanation bears sufficient credibility. An interpretation of 11 U.S.C. § 727(a)(5) mandating documentary corroboration in all instances at a peril of losing a discharge would impermissibly strip purpose and meaning from 11 U.S.C. § 727(a)(3), an independent and separate basis for denying discharge.

*In re Bodenstein*, 168 B.R. at 34 (citations omitted).[5]

The Trustee's Fifth Claim for Relief for denial of the Debtor's discharge pursuant to 11 U.S.C. § 727(a)(5) is based upon his allegation that:

> [U]pon examination of the Debtor at the § 341 meetings, the Trustee determined that he would require more information and books and records of the Debtor so as to determine if there was a satisfactory reason why, when, and how, the Debtor had accrued over $30,000 worth of credit card debt after receiving almost $140,000 in additional income within the last year.

Complaint ¶ 30.

The Trustee identifies the Sale Proceeds and the Debtor's IRA and pension account withdrawals as assets that the Debtor possessed at one time but that are no longer available for her creditors. These assets are reflected in the closing statement and settlement statement of the sale of the East 33rd Street Property, which show Sale Proceeds of $78,000. Debtor's Exhs. C and D. They are also reflected in the Debtor's 2003 Federal income tax return, which shows that

---

[5] Some courts have required documentary evidence to support a debtor's explanation under Section 727(a)(5). *See, e.g.*, *Scarsdale Nat'l Bank & Trust Co. v. Switzer (In re Switzer)*, 55 B.R. 991, 998 (Bankr. S.D.N.Y. 1986); *Clean Cut Tree Serv., Inc. v. Costello (In re Costello)*, 299 B.R. 882, 901 (Bankr. N.D. Ill. 2003).

the Debtor's 2003 income included a $31,435 IRA distribution and a $31,259 pension

distribution.  Debtor's Exh. D.  It is undisputed that these assets are no longer available for

creditors.

Based on the entire record, the Court finds that the Debtor had substantial and

identifiable assets prior to the Petition Date that are no longer available for her creditors.

Accordingly, the burden shifts to the Debtor to provide a satisfactory explanation for the

unavailability of these assets.

As to the proceeds of the sale of the East 33rd Street Property, the Debtor testified at trial

that she did not receive the Sale Proceeds, notwithstanding that she attended the closing and

signed the Settlement Statement indicating that the net proceeds were due to her.  Trial Tr. at

19:15-21:20.  The Debtor's trial testimony was consistent with her testimony at the July 7

Section 341 Meeting, where she testified:

> Q    Was it your understanding that you would leave this closing with any cash
>      or checks?
> A    I really didn't know.  I was only there because I was the victim of a crime.
>      . . . I was the victim of extortion.
> . . .
> Q    . . . You were at the closing, who received the checks?
> A    I don't know sir, I don't know.
> Q    You received no checks.
> A    Not that I recall, no.
> . . .
> Q    You're supposed to get $78,000.  The closing statement says that.
> A    Sir, I was at the closing because I had my house stolen from me.  I had all
>      my credit cards ran up.

Plaintiff's Exh. 6 (transcript of July 7 Section 341 Meeting) at 5:23-6:7; 10:11-16; 12:3-7.

The Debtor's testimony was corroborated by the expert testimony and report of Ms.

Boyd.  Ms. Boyd testified that the Debtor's inability to provide an accounting of the Sale

Proceeds, and more generally, the inability to account for one's personal financial situation, is a "common symptom" of persons experiencing physical and emotional domestic abuse.  Trial Tr. at 60:10-16.  She stated that persons in these circumstances experience great fear and that "it is quite common that someone would not be able to provide accurate information and would not be able to follow where their finances are if it is being controlled by the batterer."  Trial Tr. at 60:13-16.

As to the Debtor's withdrawals from her IRA and pension accounts, the Debtor testified at trial that these funds were used for "basic survival" and for her son's tuition.  She testified:

> Q    The money that you withdrew from your pension and annuity, the Sun Life account . . . what was that money used for?
> A    We had no money for food.  I was not working at the time.  The electricity was not shut off because Con Edison had made a mistake.  So we got it back on.  The gas was being shut off.  We had no phone.  We had nothing. We needed a lot of basic survival.  I owed people a lot of money at that point, too.  We had to move.
> . . .
> Q    Where was that money kept once you received the money?
> A    The money was used to do basic living expenses, to move and to pay my son's tuition.

Trial Tr. at 33:10-19; 37:13-16.

Here too, the Debtor's testimony was corroborated by Ms. Boyd's expert testimony and report.  Ms. Boyd gave her expert opinion that "due to the trauma of the situation, [the Debtor] was very fearful of her life and her children's safety at that time and therefore was unable to control her finances due to intimidation and threats by her abusive partner."  Trial Tr. at 63:8-12.

The Court had the opportunity to observe the Debtor's demeanor as a witness and finds that the Debtor testified credibly, reasonably, and in good faith that she did not control the disposition of the Sale Proceeds, and that she used the funds withdrawn from her IRA and

pension accounts for her family's basic living expenses, educational expenses, and moving expenses. The Court further finds that the Debtor's testimony is corroborated by the expert testimony and report of Ms. Boyd, including her expert opinion that a person experiencing physical and emotional domestic abuse may lose control of the ability to control or account for her personal financial situation. No contrary expert testimony was offered by the Trustee.

For these reasons and based on the entire record, the Court finds that the Debtor has showed that under all of the circumstances of her case, she has satisfactorily explained the loss of her assets or deficiency of her assets to meet her liabilities. Accordingly, the Trustee's objection to the Debtor's discharge under 11 U.S.C. § 727(a)(5) is denied.

### Conclusion

For the reasons stated herein, the Trustee's objections to the Debtor's discharge based upon 11 U.S.C. §§ 727(a)(3), 727(a)(4)(D), and 727(a)(5) are denied. Accordingly, the Complaint is dismissed. An order in conformity with this Memorandum Decision shall be entered simultaneously herewith.

Dated: Brooklyn, New York
      August **_1_**, 2006                        ___*s/Elizabeth S. Stong*_____
                                         ELIZABETH S. STONG
                                         UNITED STATES BANKRUPTCY JUDGE